UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

PAUL C. HAMILTON,

           Plaintiff,

   v.

J.A. YATES, et al.,

           Defendants.

Case No.  1:10-cv-1925-LJO-MJS (PC)

**FINDINGS AND RECOMMENDATIONS TO:**

**(1) DENY PLAINTIFF'S MOTION TO STRIKE MOTION FOR SUMMARY JUDGMENT (ECF No. 59),**

**(2) GRANT DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S SUR-REPLY (ECF No. 62),**

**AND**

**(3) GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 54)**

**FOURTEEN (14) DAY OBJECTION DEADLINE**

**I.    INTRODUCTION AND PROCEDURAL HISTORY**

      Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights action brought pursuant to 42 U.S.C. § 1983. (ECF Nos. 1-2.) The matter proceeds against Defendants Mattingly, Trimble, Spearman and Yates on Plaintiff's Eighth Amendment conditions of confinement claim. (ECF Nos. 23 & 24.)

      On October 3, 2013, the Court issued a discovery and scheduling order, setting

1  an August 14, 2014 deadline for filing dispositive motions. (ECF No. 44.) Defendants

2  sought and were granted an extension of time to September 22, 2014 to file a

3  dispositive motion. (ECF Nos. 48, 49.) Defendants filed their motion for summary

4  judgment on September 22, 2014. (ECF No. 54.) Plaintiff filed an opposition (ECF No.

5  58), and also filed a motion to strike Defendants' summary judgment motion as untimely

6  (ECF No. 59). Defendants filed a reply. (ECF No. 60.) Plaintiff filed a sur-reply. (ECF

7  No. 61.)

8      Defendants moved to strike Plaintiff's sur-reply. (ECF No. 62.) Plaintiff opposed

9  Defendants' motion to strike. (ECF No. 63.)

10      These matters are deemed submitted pursuant to Local Rule 230(*l*).

11  **II.    PLAINTIFF'S MOTION TO STRIKE**

12      The Court turns first to Plaintiff's motion to strike Defendants' motion for

13  summary judgment. In his opposition to Defendants' motion, Plaintiff argues that the

14  motion should be stricken as untimely since filed more than thirty days after the close of

15  discovery.

16      As the Court previously explained in its Order denying Plaintiff's motion for

17  judgment on the pleadings (ECF Nos. 53 & 57), Federal Rule of Civil Procedure 56(b)

18  provides: "Unless a different time is set by local rule or the court orders otherwise, a

19  party may file a motion for summary judgment at any time until 30 days after the close

20  of discovery." (Emphasis added.) The thirty-day deadline set out in Rule 56(b) is

21  inapplicable here, where the Court's discovery and scheduling order set August 14,

22  2014 as the deadline for filing dispositive motions, and then extended that deadline to

23  September 22, 2014.

24      Next, Plaintiff argues that the September 22, 2014 deadline applies only to

25  dispositive motions, and Plaintiff's argues that motions for summary judgment are not

26  dispositive motions. Plaintiff is incorrect. A motion for summary judgment is a motion

27  which has the potential to dispose of the entire case or one or more claims in it.

28      Defendants met the extended deadline for filing this dispositive motion for

2

summary judgment. Accordingly, Plaintiff's motion to strike Defendants' motion for summary judgment should be denied.

**III.    DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S SUR-REPLY**

The Court next considers Defendant's motion to strike Plaintiff's sur-reply. Generally, no briefing on a motion is permitted beyond the opposition and reply, absent leave of the Court. Here, the Court did not grant Plaintiff leave to file a sur-reply, and the Court does not desire any further briefing on the motion. While a party should be given leave to file a sur-reply if his opponent presents new evidence in the reply, Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996), no new evidence was presented with Defendants' reply in this case. Therefore, the Court will recommend that Defendants' motion to strike be granted and Plaintiff's sur-reply be stricken. It was not considered in addressing Defendants' motion for summary judgment here.

**IV.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**A.    Legal Standards**

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Wash. Mut. Inc. v. United States, 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed R. Civ. P. 56(c)(1). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than

1   for him. <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007).

2   Defendants do not bear the burden of proof at trial and, in moving for summary

3   judgment, they need only prove an absence of evidence to support Plaintiff's case. <u>In re</u>

4   <u>Oracle Corp. Securities Litigation</u>, 627 F.3d 376, 387 (9th Cir. 2010).

5       In judging the evidence at the summary judgment stage, the Court may not make

6   credibility determinations or weigh conflicting evidence, <u>Soremekun</u>, 509 F.3d at 984,

7   and it must draw all inferences in the light most favorable to the nonmoving party and

8   determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite</u>

9   <u>de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th

10  Cir. 2011).

11      **B.**    **Undisputed Facts**

12      This action proceeds against Defendants Mattingly, Trimble, Spearman, and

13  Yates on Plaintiff's Eighth Amendment claim that he was unconstitutionally denied

14  outdoor exercise during a lockdown and a modified program following a riot. (ECF No.

15  24.)

16      Plaintiff complains, in essence, that he was subjected to prolonged, restricted

17  conditions of imprisonment, including a period of lock down, solely because he

18  defended himself when attacked by others in a riot and because Defendants wrongfully

19  treated him as a "Black" inmate when his correct classification was "Other."

20      To properly evaluate whether the facts actually are in dispute, a detailed

21  recitation of the history of the riot and the prison's response to it is necessary. This

22  chronology, necessarily based almost exclusively on the only competent relevant

23  evidence available -- Defendants' declarations – goes a long way toward enabling the

24  Court to understart the multi-layered, prolonged, investigative and rehabilitative efforts

25  which had to be undertaken in response to an event of the magnitude described here. In

26  any event, based on the submissions of the parties (ECF Nos. 54, 59, 60), the Court

27

28

finds that the following facts are undisputed:[1]

Plaintiff is an African-Bahamian inmate who was, at all times relevant to this action, housed on C Facility at Pleasant Valley State Prison ("PVSP") in Coalinga, California. (First Am. Compl., ECF No. 10, at "iv-a"; Pl.'s Dep., ECF No. 59-2, at 10:8-25.) Though he was classified as an "Other" inmate, Plaintiff was housed with Black inmates during the relevant period. (Heath Decl., Ex. C, ECF No. 54-9, at 19,;Ex. D, ECF No. 54-9 at 43; First Am. Compl., Ex. 1.)

### 1.    The May 31, 2007 Riot

On May 31, 2007, a riot involving approximately 300 inmates took place in the C Facility Yard at PVSP. (Spearman Decl., ECF No. 54-8, ¶ 9; Mattingly Decl., ECF No. 54-7, ¶ 7.) It was later determined that approximately 180 Black inmates, 105 Southern Hispanic inmates, and 35 Mexican National inmates were involved. (Spearman Decl. ¶ 9; Hoyt Decl. ECF No. 54-6, ¶ 10.)

The riot resulted in inmate injuries and required the use of chemical agents and non-lethal force to put a stop to it. (Spearman Decl. ¶ 9.) Three weapons were found, and some of the injuries sustained were consistent with the use of a stabbing weapon. (Hoyt Decl. ¶ 10.)

### 2.    PVSP's Response to the Riot

#### a.    Lockdown and Modified Program

As is discussed in more detail below, each of the named Defendants was at relevant times an associate warden with various duties relative to the response to the riot. The collective response is first outlined here.

On June 1, 2007, PVSP implemented a lockdown in response to the riot. The term "lockdown" is often used interchangeably with "modified program" to reflect a

---

[1] Although Plaintiff denied numerous facts in Defendants' statement of undisputed facts, he does not cite to evidence in the record to support his denials. See Fed. R. Civ. P. 56(c). Accordingly, the Court concludes that those improperly disputed facts are, in fact, undisputed. Farrakhan v. Gregoire, 590 F.3d 989, 1002 (9th Cir. 2010) (quoting Beard v. Banks, 548 U.S. 521, 527 (2006)) (finding that a party opposing summary judgment who "fail[s] [to] specifically challenge the facts identified in the [moving party's] statement of undisputed facts ... is deemed to have admitted the validity of [those] facts ....").

1  change or disruption to a yard's normal program. (Hoyt Decl. ¶ 4.) A true lockdown,
2  though, results in the in-cell confinement of all inmates, while a modified program
3  affects only a specific group or groups of inmates. (Hoyt Decl. ¶ 4; Spearman Decl. ¶ 4.)

4  During the lockdown (and later, modified program), inmates involved in the riot
5  were allowed to leave their cells for necessary services. (Spearman Decl. ¶ 30; Trimble
6  Decl., ECF No. 54-5, ¶ 23; Hoyt Decl. ¶ 38.) They were provided showers, escorted to
7  medical services, and allowed access to the law library and their medical and priority
8  ducats were honored. (Spearman Decl. ¶ 30.)

9  Maintaining a lockdown and modified program is difficult for the administration of
10 prison facility and imposes an extra burden on staff. (Hoyt Decl. ¶ 40.) All of the inmates
11 subject to the lockdown or modified program must be showered separately. (Id.) All
12 inmates must be escorted to medical appointments, the library, and other appointments,
13 and fed in their cells. (Id.) All of these tasks, plus the obligation to investigate the cause
14 and circumstances of the riot, were added to the usual responsibilities of administering
15 standard programs for inmates not subject to the modified program. (Id.) In addition, all
16 inmates housed in the dayrooms had to be secured before any of the inmates on the
17 modified program could leave their cell. (Id.) These added burdens dictated that
18 investigative issues be resolved as soon as possible so that all inmates could be
19 returned to a normal program. (Hoyt Decl. ¶ 40.; Spearman Decl. ¶ 18.)

20 When a riot occurs and disrupts the normal program, a Program Status Report
21 ("PSR") is prepared to document which inmates are affected and why and to identify the
22 event or information which led to the modifications. (Hoyt Decl. ¶ 6.) Typically, the PSRs
23 are prepared and updated as information becomes available through investigation of the
24 triggering incident. (Id.) PSRs can be issued at various levels and may cover a specific
25 facility within the prison or apply to the entire prison. (Id.) This incident was assigned
26 log number PVP-FCP-07-05-0220. (Hoyt Decl. ¶ 10.)

27 PSRs issued at the facility level are usually drafted by the captain or designee,
28 such as a lieutenant, reviewed by the Associate Warden for the facility, and sent to the

1   Warden's office for approval. (Hoyt Decl. ¶ 8.) The PSR articulates the reasons for

2   modifying a program, the investigation to be undertaken, and the information collected

3   to date. (Id.) The Warden or his designee, such as the Chief Deputy Warden or

4   Associate Warden, reviews the PSR and approves it or requests additional information.

5   (Id.)

6        Among the staff at PVSP, only the Warden, or his or her designee, has the

7   authority to modify or end a modified program. (Spearman Decl. ¶ 46.)

8                     b.   **Investigation Into Cause Of Riot**

9        Many steps were taken to investigate the cause of the May 31, 2007 riot, resolve

10  the issues which helped bring it about, and return the facility to normal program.[2] (Hoyt

11  Decl. ¶ 13.) The entirety of Facility C was searched -- the yard, roofs, buildings,

12  dayrooms, cells, perimeter, and all inmates in that facility. (Id. ¶ 14.) The searches were

13  initiated in an effort to find additional weapons and evidence of the cause of the riots

14  and to uncover plans, if any, for future violence. (Id.)

15       Facility C correctional staff conducted formal interviews of inmates on the facility

16  to determine the cause of the riot and determine whether the groups involved had

17  resolved their disputes and were ready to return to normal program together. (Hoyt

18  Decl. ¶ 16; Spearman Decl. ¶ 14.)

19       The staff worked to identify the "shot callers" or leaders of the groups involved --

20  Southern Hispanics, Blacks, and Mexican Nationals -- and interview and work with them

21  to try to negotiate and resolve disputes between groups. (Hoyt Decl. ¶ 17; Spearman

22  Decl. ¶ 15.) The leaders were asked about causes of the riot and whether disputes still

23  existed between the groups. (Hoyt Decl. ¶ 17.)

24       When the leaders agreed to meet, they were secured separately to make sure

25  they would not attack each other. (Hoyt Decl. ¶ 17; Spearman Decl. ¶ 15.) The meetings

26  were to be repeated until the leaders were able to reach a solution. (Spearman Decl. ¶

27

28  [2] Plaintiff does not believe that an investigation was conducted, but he admits that he has no personal knowledge regarding whether one was or not. (Pl.'s Dep. at 30:11-23.)

15.) The leaders were then sent back into the population to speak to the other members of their groups and inform them of the resolution. (Id.) This process was time consuming, but necessary to resolve potentially disruptive issues and return the inmates to a normal program. (Id.)

c.   <strong>Staff Meetings</strong>

Weekly meetings were held with the Associate Warden, Warden, Chief Deputy Warden, and representatives of ISU, the Investigative Gang Unit, and other staff who had relevant information. (Hoyt Decl. ¶ 18.) Staff reported the information they had, and they made and received recommendations on how to continue moving back to a normal program. (Hoyt Decl. ¶ 18.)

On the facility, meetings were regularly held with the Associate Warden and other staff to process information from the investigation and work toward safe return of the program to normal program. (Hoyt Decl. ¶ 18.)

PSRs were forwarded to the Associate Director of CDCR for review. (Trimble Decl. ¶ 12.)

3.   <strong>Controlled Unlock To Normal Programming</strong>

a.   <strong>Necessity Of Controlled Unlock</strong>

Following the riot, staff at PVSP "phased" the return of inmates to normal programming based on the results of their investigation. A "controlled unlock" (gradual resumption of normal routine by releasing a small group of inmates in a controlled environment) was necessary for safety as certain inmates were released. . (Hoyt Decl. ¶ 29.) The controlled unlock was monitored closely to ensure its success, and inmates among the involved groups were interviewed on an ongoing basis to make sure there were no threats of future violence. (Id. ¶ 32.)

It would have been impractical to release involved inmates to the yard one entire group at a time because staff resources were being used to conduct time-consuming searches and interviews and administer the normal program for inmate groups not involved in the riot. (Hoyt Decl. ¶ 34; Spearman Decl. ¶ 15.)

8

1   Also, releasing one group of inmates to the yard at a time would have afforded

2   that group an opportunity to organize or coordinate further attacks on the other group.

3   (Hoyt Decl. ¶ 34.) It was not uncommon for the inmates in the non-involved groups to

4   work with one of the affected groups to coordinate further efforts and attacks. Hoyt Decl.

5   ¶ 34; Trimble Decl. ¶ 28; Mattingly Decl. ¶ 21.)  Investigative results also suggested that

6   inmates were at risk of attack from members of their own groups because there was a

7   "green light" in effect and, with it, the possibility of internal retaliation. (Hoyt Decl. ¶ 34;

8   Trimble Decl. ¶ 28; Mattingly Decl. ¶ 21.) (A "green light" is an order to all members of

9   one group to attack another group whenever the opportunity presents itself. (Hoyt Decl.

10  ¶ 24.))  At the time of the lockdown and modified program, C Facility housed some

11  inmates in the dayrooms. (Hoyt Decl. ¶ 37.) An inmate housed in the dayroom could be

12  loyal to the Southern Hispanics or Black inmates and work with them to carry out an

13  attack when being escorted to another part of the prison. (Id.) This also increased the

14  risk to escorting staff. (Id.)

15              b.     **Return to Normal Programming**

16  Based on investigation results, it was determined that Whites, Northern

17  Hispanics, Fresno Bulldogs, and "Others" were not involved in the riot. (Hoyt Decl. ¶

18  19.) After searches of those inmates were completed, they were returned to normal

19  program on Friday, June 22, 2007. (Id.)

20   Investigation also revealed that the Black inmates were caught off guard by the

21  attack on them by Southern Hispanics. (Hoyt Decl. ¶ 20.) The attack created significant

22  Black inmate animosity toward the Southern Hispanics. (Id. ¶ 21.) During the lockdown

23  and modified program, the Black inmates at first refused to meet with the Southern

24  Hispanics and Mexican Nationals to try to resolve issues that caused the riot. (Id. ¶ 22.)

25  The Black inmates sought to retaliate against the Southern Hispanic inmates

26  responsible for the attack. (Hoyt Decl. ¶ 23.) Interviews with Black inmates revealed a

27  "green light" was in in place directing Black inmates to attack Southern Hispanic

28  inmates, even those not involved in the riot. (Id. ¶ 24.) .

9

Interviews also revealed risk of internal retaliation: if any Black inmate, even one not involved in the riot, passed an opportunity to attack a Southern Hispanic inmate, he would be punished by other Black inmates. (Hoyt Decl. ¶ 25.)

Once the groups agreed to start meeting, meetings between them took place as often as daily, but at least once per week, (Hoyt Decl. ¶ 26.) The ability to hold the meetings was dependent on inmates' willingness to speak and the information they were willing to provide. (Id.)

The meetings revealed that Mexican National' participation had been minimal. Accordingly, unlock of Mexican Nationals began on August 6, 2007, and was completed on August 10, 2007. (Hoyt Decl. ¶ 27.)

By August 10, 2007, interviews with Southern Hispanic and Black inmates indicated that the disputes between them had been resolved sufficiently to enable the groups to resume normal program. (Hoyt Decl. ¶ 28.) A controlled unlock of the Southern Hispanics and Black inmates began on August 14, 2007. (Id. ¶ 29.) The controlled unlock was continuously monitored and participants' interviews continued. (Spearman Decl. ¶ 26.)

By August 28, 2007, staff were able to begin release all non-involved Southern Hispanic and Black inmates at the rate of one building per day. (Hoyt Decl. ¶ 30.) All riot participants remained on modified program. (Id.)

By September 16, 2007, all inmates had been released to normal program. (Hoyt Decl. ¶ 31.)

4.   **Plaintiff's Participation in the Riot**

On July 5, 2007, a letter Plaintiff authored relating to the riot was received in the C Facility Program Office. (Heath Decl., Ex. A, ECF No. 54-9 at 10-11.) Despite his classification as an "Other" inmate, Plaintiff stated he associated himself with Black inmates on Facility C, and he admitted involvement in the riot:

> I was in my group, made up of Blacks, as is common
> practice. And as we were preparing to sit, we looked around
> to see what was going on. As we did so, we could see the

10

> Southerners, as a group, running toward us, with weapons and with their shirts wrapped around their fists. Faced with this, we had no choice but to stand our ground. … The fighting went on for five to seven minutes. The Southerners got the worst of it and had to retreat. … My fellow Blacks and I are certain that, had we not defended ourselves, we would be seriously hurt, perhaps even dead!

(Id.)

Based on the content of this letter and an analysis of the schematics of the riot, it was determined that Plaintiff's participation was in fact offensive and not defensive, as he claimed. (See Heath Decl., Ex. A.)

It also was determined that Plaintiff's letter showed he associated with Black inmates and not "Other" inmates, his previously-documented classification group. (See Heath Decl., Exs. A, G.)

On July 17, 2007, Plaintiff was issued a Rules Violation Report ("RVR") for Participation in a Riot. (Heath Decl., Ex. A.) Following a hearing, Plaintiff was found guilty and assessed a credit forfeiture of 90 days. (Heath Decl., Ex. A.) He was also sent to the Special Housing Unit ("SHU") for four months. (Id., Ex. H.)

Spearman, as the Associate Warden, was the chief disciplinary officer for C Facility. (Spearman Decl. ¶ 16.) In that role, he was responsible for reviewing and approving all of the RVRs, including the one charging Plaintiff with Participation in a Riot. (Id.)

An inmate like Plaintiff, though not classified as Black, remained on modified program because there was evidence he was affiliated with and/or loyal to the Black inmates. In Plaintiff's case, he specifically and repeatedly identified with the Black inmates. (Spearman Decl. ¶ 35; see also Pl. Dep. 25:17-18 ("And, you know, blacks against Mexicans, we're going to win. … That's us blacks."), 26:21-22 ("They – they separate us. Put the blacks in the chow hall and put the Hispanics somewhere else."), 33:3-4 ("When I – and I explain to you when I say 'us,' I mean I'm black also.").)

Unless prison staff received information clearing an entire group involved in the riot, an individual inmate potentially loyal to an involved group could not be released

from modified program without putting staff and inmates at risk of further violence. (Spearman Decl. ¶ 35.)

Plaintiff returned to normal program sometime in September 2007. (Heath Decl., Ex. D.)

### 5. Plaintiff's Appeals

#### a. Appeal Log No. PVSP-C-07-01933

Following the riot, Plaintiff filed an appeal, assigned Appeal Log No. PVSP-C-07-01933, in which he complained that the Black population of C Facility were being discriminated against in the lockdown and modified program and being denied equal treatment. (See Heath Decl., Ex. B, ECF No. 54-9 at 17.)

Plaintiff's appeal was partially granted at the First Level on July 25, 2007, with Defendant Spearman reviewing and signing off on J. Woodend's notes. (Heath Decl., Ex. B; Spearman Decl. ¶ 40.) Spearman informed Plaintiff that the lockdown and modified program were not punishment. Rather, they were necessary to evaluate threat issues relative to the reason  for the riot and any residual issues. and to ensure safety of the lockdown prisoner as well  other inmates and Staff. (Heath Decl., Ex. B.)

This appeal was denied at the Second Level on September 17, 2007, by Defendant Trimble on behalf of Defendant Yates. (Heath Decl., Ex. E.) Plaintiff was informed that "Staff will lockdown any group of inmates if the safety and security of the institution is jeopardized. The lockdowns are not for the purpose of punishing you or anyone else, the purpose of a lockdown is to keep staff and inmates safe while the prison decided who should be allowed to program." (Id.) The response also determined that the language in Plaintiff's appeal indicated his apparent loyalty to the group of Black inmates involved in the riot. (Id.; Trimble Decl. ¶ 35.)

Plaintiff's appeal was also denied at the Director's Level for the same reason as the denial of his appeal at the Second Level. (First Am. Compl., Ex. 2.)

#### b. Appeal Log No. PVSP-C-07-02125

Also following the riot, Plaintiff filed an appeal, assigned Appeal Log No. PVSP-

12

C-07-02125, in which he complained of the denial of yard and other out-of-cell activities due to the lockdown and modified program. (See Heath Decl., Ex. C; First Am. Compl., Ex. 1.) He stated that, though he was housed with Black inmates, his ethnic classification is "Other," and, as such, he requested that he be allowed the same out-of-cell activities that other inmates with his ethnic classification were afforded.

This appeal also was denied at the First Level on August 2, 2007, after Defendant Spearman reviewed and signed off on D. Nelson's notes. (Heath Decl., Ex. C.) Plaintiff was informed that, based on the letter that he authored, supra, and based on the schematics of the riot, it was evident that he "align[ed] [him] self with Black inmates to fight Southern and Mexican National inmates." (Heath Decl., Ex. C.; Spearman Decl. ¶ 41.)

Plaintiff's appeal was then screened at the Second Level as duplicative of his previous appeal, Appeal Log No. PVSP-C-07-01933. (First Am. Compl., Ex. 1.)

c.   **Appeal Log No. PVSP-C-07-02668**

Lastly on August 1, 2007, Plaintiff filed an appeal, assigned Appeal Log No. PVSP-C-07-02688, challenging his new classification as a Black inmate and seeking reinstatement as an Other inmate. (See Heath Decl., Ex. D.) Defendant Spearman reviewed and signed off on this appeal, but Plaintiff thereafter withdrew it because he had returned to normal programming as of the time of the first level review. (Id.; Spearman Decl. ¶ 42.)

6.   **Plaintiff's Injury**

Plaintiff claims that, as a result of the lockdown and modified program, which remained in effect from June 1, 2007 through September 16, 2007, he suffered a stroke: "a sudden severe attack of numbness to the face and the right side of my body. Paralyzed – I was paralyzed. My vision – I lost my vision. I was weak. I couldn't speak. I had a severe headache at the time." Pl.'s Dep. at 50:17-21. The stroke occurred on June 5, 2007, five days after the lockdown and modified program were initiated. (Pl.'s Dep. at 55-56.)

Plaintiff self-diagnosed himself after comparing his symptoms with information he read in Mosby's Medical, Nursing & Allied Health Dictionary, Sixth Edition. (Pl.'s Dep. at 52:2-14.) Plaintiff has not been diagnosed by a medical professional; he is not a licensed physician; and he did not report his symptoms for a week after they first are claimed to have appeared and then made only a passing comment about them to an unidentified nurse delivering medication to inmates. (Id. at 50-52.)

### 7.   The Defendants' Roles

#### a.   Defendant Spearman

At the time of the riot and during the subsequent lockdown and modified program, Defendant Spearman was an Associate Warden at PVSP and the acting Associate Warden for Facilities C and D. (Spearman Decl. ¶ 5.)

As the acting Associate Warden for Facility C, Spearman performed a number of tasks, including working with facility staff and other members of the prison administration to formulate a plan to investigate the cause of the riot, to resolve the issues that caused the riot, and to return the entire facility back to normal program as quickly as was safely possible. (Spearman Decl. ¶ 10.)

Spearman also reviewed the PSRs created for the lockdown and modified program in response to incident PVP-FCP-07-05-0220 to make sure they were accurate and made proper recommendations. (Spearman Decl. ¶ 11.) In addition, as the Associate Warden, Spearman attended the weekly staff meetings. (Id. ¶ 19.)

Spearman's role was primarily administrative; he was not personally involved in conducting the interviews, searches, or investigations; he relied on reports from the staff members. (Spearman Decl. ¶ 10.)

With respect to the lockdown and modified program, Spearman was not the Warden's designee. (Spearman Decl. ¶ 47.) Spearman did not have authority to and did not implement, adjust, or terminate the lockdown and modified program. (Id. ¶ 48.)

Based on the reports he received, Defendant Spearman believed that the modified program/lockdown: (1) was a response to a severe and unusually large prison

14

riot; (2) was necessary because of the risk that significant violence could reoccur between the groups involved in the riot; (3) was designed to protect the lives and safety not only of staff, but also of inmates who were in imminent danger of continued violence; (4) was maintained only as long as necessary to identify the involved groups and inmates and resolve disputes between them so that they could safely return to a normal program; (5) did not last any longer than was reasonably deemed necessary to protect the lives and safety of inmates and staff (6) was not intended to prejudice or harass anyone; and (7) did not violate any statutory or constitutional rights. (Spearman Decl. ¶ 43.)

### b. **Defendant Trimble**

At the time of the May 31, 2007 riot, Defendant Trimble was the Associate Warden for Business Services and, at times, the acting Chief Deputy Warden in the Chief Deputy Warden's absence. (Trimble Decl. ¶ 1.)

As the acting Chief Deputy Warden at PVSP, Trimble would review the PSRs to make sure they were accurate, and made appropriate recommendations regarding the lockdown and/or modified program. (Trimble Decl. ¶ 6.) He met with staff, discussed their investigative findings and reviewed all incident reports and other information gathered. (Id.)

As the acting Chief Deputy Warden, Trimble was also involved in the day-to-day operation of the prison. (Trimble Decl. ¶ 6.) And as the acting Chief Deputy Warden and Associate Warden, Trimble attended daily meetings with prison executive staff where all prison issues were discussed. (Id.)

In the case of the lockdown and modified program at issue here, Trimble reviewed and approved some, but not all, of the PSRs for Warden Yates. (Trimble Decl. ¶ 8.) The rest were reviewed and approved by Defendant Mattingly.

Based on reports he received from staff at PVSP, Trimble came to the same seven conclusions Spearman reached (Spearman Decl. ¶ 43, infra) about the response to the riot.  (Trimble Decl. ¶ 33.)

### c.   **Defendant Mattingly**

At the time of the May 31, 2007 riot at PVSP, Defendant Mattingly was the Associate Warden for Facilities A and B. (Mattingly Decl. ¶ 1.) He was also worked as the acting Chief Deputy Warden at PVSP, and was later promoted to Chief Deputy Warden. (Id.)

As the acting Chief Deputy Warden, Mattingly would review the PSRs to make sure they were accurate and based on correct information, and make appropriate recommendations regarding the lockdown and modified program. (Mattingly Decl. ¶ 6.) He would meet with the facility staff and discuss what they had learned from their investigation and review all of the information gathered. (Id.) He also reviewed and approved incident reports on behalf of the Warden. (Id.)

As the acting Chief Deputy Warden, Mattingly was also involved in the day-to-day operation of the prison. (Mattingly Decl. ¶ 6.) As the acting Chief Deputy Warden and Associate Warden, he attended daily meetings with the prison executive staff, at which all of the issues throughout the prison were discussed. (Id.)

In the case of the lockdown and modified program at issue here, Defendant Mattingly reviewed and approved some, but not all, of the PSRs for Warden Yates. (Trimble Decl. ¶ 8.) The rest were reviewed and approved by Defendant Trimble. Mattingly reviewed and approved the incident report on this riot. (Mattingly Decl. ¶ 9.)

Mattingly's beliefs and conclusions about the response to the riot mimicked Spearman's and Trimble's point for seven points. (Mattingly Decl. ¶ 32.)

### d.   **Defendant Yates**

Defendant Yates was the Warden at PVSP at the time of the May 31 riot and subsequent lockdown and modified program. (First Am. Compl. at 3.) As the Warden, Yates would have attended the weekly meetings regarding the lockdown and modified program for incident PVP-FCP-07-05-0220. (Mattingly Decl. ¶ 12; Trimble Decl. ¶ 12.)

## C.   **Analysis**

### 1.   **Legal Standard – Conditions of Confinement**

The Eighth Amendment protects prisoners from inhumane methods of punishment and confinement. Farmer v. Brennan, 511 U.S. 825 (1994); Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006). Thus, no matter where they are housed, prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety. Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted). To establish a violation of the Eighth Amendment, the prisoner must "show that the officials acted with deliberate indifference...." Labatad v. Corrections Corp. of America, 714 F.3d 1155, 1160 (9th Cir. May 1, 2013) (citing Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002).

The deliberate indifference standard involves both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." Farmer, 511 U.S. at 834. Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate health or safety." Id. at 837; Anderson v. County of Kern, 45 F.3d 1310, 1313 (9th Cir. 1995).

Objectively, extreme deprivations are required to make out a conditions of confinement claim and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citations and quotations omitted). Some conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets. Wilson v. Seiter, 501 U.S. 294, 304-05 (1991) (comparing Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979) (outdoor exercise required when prisoners otherwise confined in small cells almost 24 hours per day), with Clay v. Miller, 626 F.2d 345, 347 (4th Cir. 1980) (outdoor exercise not required when prisoners otherwise had access to dayroom 18 hours per day)). Further, temporarily

unconstitutional conditions of confinement do not necessarily rise to the level of constitutional violations. See Anderson, 45 F.3d 1310, ref. Hoptowit v. Ray, 682 F.2d 1237, 1258 (9th Cir. 1982) (abrogated on other grounds by Sandin v. Conner, 515 U.S. 472 (1995) (in evaluating challenges to conditions of confinement, length of time the prisoner must go without basic human needs may be considered)).

If an objective deprivation is shown, a plaintiff must show that prison officials subjectively acted with a sufficiently culpable state of mind-that of "deliberate indifference." Wilson, 501 U .S. at 303; Johnson, 217 F.3d at 733. In other words, a prison official is liable for inhumane conditions of confinement only if "the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. Further, the plaintiff must show that the defendant officials had actual knowledge of the peril to a plaintiff's basic human needs and deliberately refused to meet those needs. Johnson, 217 F.3d at 734.

Depriving inmates of outdoor exercise can violate the Eighth Amendment. E.g., LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993); Spain v. Procunier, 600 F.2d 189 (9th Cir. 1979). The Ninth Circuit has not specified exactly how much exercise time passes constitutional muster, though it has found 45 minutes per week insufficient, Allen v. Sakai, 48 F.3d 1082, 1088 (9th Cir. 1994), and agreed that two hours per week was enough, Pierce v. Cty. of Orange, 526 F.3d 1190 (9th Cir. 2008). Moreover, in emergency situations, prison officials may constitutionally curtail inmates' access to outdoor exercise altogether until order is restored. Noble v. Adams, 646 F.3d 1138, 1143 (9th Cir. 2011); Norwood v. Vance, 591 .3d 1062, 1070 (9th Cir. 2010). It is not clearly settled "how, according to the Constitution, or when," an institution must reinstitute normal exercise routines following a lockdown or other emergency, but prison officials are "entitled to wide ranging deference" in this regard. Noble, 646 F.3d at 1143. Only if officials' judgment "manifest[s] either deliberate indifference or an intent to inflict

1   harm" will a court conclude that deprivation of exercise time violates the Eighth

2   Amendment in an emergency situation. See id.

3           2.   **Parties' Arguments**

4           Defendants argue that Defendant Spearman is entitled to summary judgment

5   because he did not have authority to, and did not undertake to, modify or end the

6   lockdown or modified program. (ECF No. 54-3 at 13.) All Defendants argue, in effect,

7   that they acted out of institutional necessity and reasonableness in response to the riot

8   and were not deliberately indifferent in placing Facility C, and Plaintiff, on lockdown and

9   in a modified program. (Id. at 14-18.) Finally, Defendants argue that they are entitled to

10  qualified immunity. (Id. at 19-22.)

11          Plaintiff appears to argue that all of the Defendants were involved in the

12  deprivation of outdoor exercise because they reviewed and/or received Plaintiff's

13  administrative appeal. (ECF No. 58 at 4-5.) Plaintiff maintains that there was no basis

14  for including him in the lockdown and modified program because he was only defending

15  himself during the riot. (Id.) He characterizes Defendants' reasons for maintaining the

16  lockdown as "inconsequential logistical concerns." (ECF No. 59-2 at 3.) Plaintiff

17  contends that surveillance footage of the riot would have put Defendants on notice that

18  deprivation of outdoor exercise would violate Plaintiff's constitutional rights. (Id.) Plaintiff

19  argues that the Defendants are not entitled to qualified immunity because he had a

20  clearly established right to outdoor exercise. (Id. at 10.)

21          3.   **Discussion**

22          Before proceeding to the merits of Defendants' motion, the Court addresses a

23  preliminary matter. Plaintiff has often made reference to surveillance footage of the riot

24  and suggested it would support his version of his role in the riot (i.e., that he was acting

25  defensively and not offensively). (ECF No. 58 at 11, 59-2 at 1.)

26          It is a party's obligation to obtain and properly present evidence it wants the

27  Court to consider. No such video footage has ever been submitted to the Court for

28  review.

19

Plaintiff's suggestion that the video would refute RVR hearing findings (that he acted offensively and should be reclassified as a Black inmate or an inmate loyal to Black inmates) is not before the Court. Only Plaintiff's Eighth Amendment conditions of confinement claim remain. (See ECF Nos. 21-23.)   A surveillance video showing Plaintiff merely defending himself during the riot would have little, if any, impact on the Court's evaluation of the propriety of steps taken by the prison in response to the riot generally and, specifically, in the manner it treated Plaintiff after the riot in light of his admitted role in it and his affiliation with those threatening retaliation against the apparent instigators.

a.   **Conditions of Confinement**

For the reasons set forth here, the Court recommends that Defendants' motion for summary judgment be granted.

Deprivation of outdoor exercise is not a per se violation of the Eighth Amendment; whether it is a violation depends on the specific facts of deprivation. Defendants move for summary judgment on the ground that there is no dispute that they were continuously, prudently, and successfully looking out for the safety and security of all prisoners and staff when placing and maintaining the C facility on lockdown and modified program. Defendants submit competent evidence setting forth the reasons for the procedures followed and the progression and timing of those procedures. They establish that: The lockdown and modified programs were implemented in response to a riot involving roughly 300 inmates. Weapons were used during the riot.   Injuries were sustained in the riot. Plaintiff participated in the riot. Plaintiff identified with the Black inmates in the riot and after it was over.   There was significant post-riot animosity on the part of Black inmates against Southern Hispanics, apparent instigators of the riot. Black inmates undertook to generate retaliation against the Southern Hispanic's and even against Black inmates who failed to attack Hispanics. Disputes between  Southern Hispanic and Black inmates giving rise to the riot were not resolved until August 10, 2007.  A "controlled unlock" of some Southern Hispanics and

1  Black inmates began on August 14, 2007 and was deemed successful.  Consequently,

2  staff began to release all non-involved Southern Hispanic and Black inmates at the rate

3  of one building per day. It took until August 28, 2007, to get all non-involved Southern

4  Hispanic and Black inmates back into normal programming. Bona fide safety concerns

5  dictated that inmates directly involved in the riot  could  not be released from modified

6  program without putting staff and inmates at risk of further violence.

7       In his opposition, Plaintiff challenges Defendants' findings as to the cause of the

8  riot and the continued threat of violence. He admits though (Pl.'s Dep. at 49:24—50:4)

9  that he was not privy to staff's investigative results, results of searches of the C Facility

10  and inmates' cells, interviews with other inmates, and discussions between the leaders

11  of the involved groups. There is no evidence that Plaintiff, beyond being a prisoner, has

12  any qualifications enabling him to address safe and appropriate methods for a prison to

13  respond to such a major disruption or the length of time it should take to ensure safety

14  of staff and inmates after such an event.  He has introduced no evidence from anyone

15  so qualified.

16       As noted, Plaintiff references surveillance footage of the riot as evidence that

17  Black inmates were merely defending themselves and were not a threat to security. As

18  noted, the video is not in evidence, but even if it were, the Court could not undertake to

19  evaluate the propriety of the prison's response to a riot based solely on a video showing

20  one group attacking and another being attacked.[3] The factors considered by the prison

21  appear reasonable and logical and go far beyond the riot itself. There is indeed no

22  competent evidence before the Court as to an appropriate prison response to a riot

23  beyond that posited by the Defense and described in detail above.

24       In sum, based upon their investigation and bona fide security concerns at the

25  prison, Defendants determined that if the involved groups and individuals loyal to them

---

26  [3] The Court considered the possibility of an equal protection claim being pursued here, but found allegations
27  essential to such a claim lacking;  it advised Plaintiff of the deficiencies in the claim and of what would be necessary
to assert such a claim, and it gave him an opportunity to amend. (ECF No. 21, pp.5-6.)  Plaintiff declined the
opportunity.  (ECF No. 22.)  Nothing in the facts since put before the Court in this motion for summary judgment or
28  otherwise suggests that such a claim could properly have been pursued..

had returned to normal program prematurely and confronted one another, more violence and further threat to the safety and security of the inmates and staff likely would have ensued. Plaintiff has presented no competent evidence to the contrary. Though at first blush one, especially one inexperienced in prison management and safety, might question why it would take three and one half months to get the entire prison and Plaintiff back into normal programming following the riot, the Court lacks experience, expertise and, more importantly, competent evidence upon which to challenge Defendants' determinations. Though perhaps surprising to a lay person, those determinations appear quite reasonable in light of all the concerns outlined in Defendant's' evidence; so does the prison's measured, gradual response to the prevailing concerns and conditions. The Court should not, and will not, substitute its judgement for those of trained professionals. Norwood, 591 F.3d at 1069 (when a prison lockdown is in response to a genuine emergency, this court "may not lightly second-guess officials' expert judgments about when exercise and other programs [can] ... safely be restored").

In light of Plaintiff's failure to present any admissible evidence countering Defendants' evidence that it was not safe to return Plaintiff to normal programming until September 2007, the Court finds that Plaintiff has failed to raise a triable issue of material fact.

Finally, even if the contrary were true, a temporary denial of outdoor exercise must cause adverse medical effects to constitute a substantial deprivation and be actionable. May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997) (denial of outdoor exercise for 22 days was temporary and insufficient to state a claim absent adverse medical effect). Plaintiff here argues, rather incredibly, that the lockdown and modified program, caused him to suffer a "stroke" on June 5, 2007, a mere five days into the modified program. (See Pl.'s Dep. at 55:16—56:1.) Plaintiff has not been so diagnosed by any qualified medical professional; he did not actively seek treatment for symptoms of any alleged stroke; and there is no competent evidence linking any symptoms to the

1   denial of exercise. Plaintiff has not raised a triable issue of fact as to whether he

2   suffered adverse consequences as a result of post-riot prison conditions.

3         Defendants' motion for summary judgment should be granted.

4         b.   **Qualified Immunity**

5         Defendants contend that even if Plaintiff had raised  a question of fact as to

6   whether Defendants acted with deliberate indifference,  each of them would be entitled

7   to qualified immunity as Plaintiff did not suffer  deprivation of a clearly established right

8   which a reasonable correctional official would have known was being violated.

9         The doctrine of qualified immunity protects government officials from liability for

10  civil damages insofar as their conduct does not violate clearly established statutory or

11  constitutional rights of which a reasonable person would have known." Pearson v.

12  Callahan, 555 U.S. 223, 231 (2009). The defendant bears the burden of establishing

13  qualified immunity. Crawford–El v. Britton, 523 U.S. 574, 586-87 (1998). The Supreme

14  Court, in Saucier v. Katz, 533 U.S. 194 (2001), outlined a two-step approach to qualified

15  immunity. The first step requires the court to ask whether, "[t]aken in the light most

16  favorable to the party asserting the injury, do the facts alleged show the officer's

17  conduct violated a constitutional right?" Saucier, 533 U.S. at 201. The second inquiry is

18  whether the right was clearly established; in other words, "whether it would be clear to a

19  reasonable officer that his conduct was unlawful in the situation he confronted." Id. In

20  Pearson, the Supreme Court gave district courts discretion to grant qualified immunity

21  on the basis of the "clearly established" prong alone, without deciding in the first

22  instance whether any right had been violated. Id. at 236; accord Ashcroft v. al-Kidd, ——

23  U.S. ——, ——, 131 S. Ct. 2074, 2080 (2011).

24        The Court finds that applicable law was not clearly established at the time

25  Plaintiff was subjected to the modified program. In Noble, first issued on March 17,

26  2011, and amended on August 2, 2011, the Ninth Circuit determined that prison officials

27  were entitled to qualified immunity with respect to a seven-month lockdown following a

28  prison riot, as

> it was not clearly established in 2002—*nor is it established yet*—precisely how, according to the Constitution, or when a prison facility housing problem inmates must return to normal operations, including outside exercise, during and after a state of emergency called in response to a major riot, here one in which inmates attempted to murder staff.

Noble v. Adams, 646 F.3d 1138, 1143 (9th Cir. 2011) (emphasis added); see also Mitchell v. Cate, 2014 WL 546338, at *17, n.8 (E.D. Cal. Feb. 11, 2014) (collecting cases about the lack of consensus on this issue). Similarly, district courts have found that "[i]t is not clearly established exactly how or when prison officials must lift a lockdown or modified program implemented in response to threats to the safety and security of the institution arising from riots or information that inmates plan to assault staff." Norwood v. Cate, 2013 WL 1127604, at *23 (E.D. Cal. March 18, 2013). In Cate, the court found that:

> In light of the undisputed evidence regarding the reasons for the lockdowns/modified programs, the investigatory steps undertaken in responding to events, and that prison officials lifted lockdowns/modified programs in stages depending on the results of the investigations, it would not have been clear to a reasonable officer that restricting an inmate's outdoor exercise in conjunction with the lockdowns/modified programs during investigations at issue here was unlawful. Therefore Defendants are entitled to qualified immunity for the lockdowns [at issue].

Id.

Here, the conduct complained of occurred in 2007 in response to a riot. As such, the conduct complained of falls within the timeline specified by the Ninth Circuit as not having clearly established law on point.

Plaintiff argues that Defendants are not entitled to qualified immunity because their arguments amount to no more than logistical concerns. See Allen v. Sakai, 48 F.3d 1082 (9th Cir. 1994). In Allen, the Ninth Circuit stated:

> The defendants attempt to excuse the deprivation by explaining that logistical problems made it difficult to provide adequate exercise. According to the defendants, scheduling an inmate's time in the exercise yard was difficult because, for security reasons, inmates had to be accompanied to the recreation yard by a guard and only one inmate could use the recreation yard at a time. We recognize that the practical

24

difficulties that arise in administering a prison facility from time to time might justify an occasional and brief deprivation of an inmate's opportunity to exercise outside. However, we cannot accept the defendants' vague reference to logistical problems as necessarily justifying, as a matter of law at the summary judgment stage, the deprivation that took place here. A rational fact-finder after hearing the evidence might determine that the defendants acted with at least deliberate indifference to Smith's basic human needs, as defined by Spain, by placing inconsequential logistical concerns that might be no more than matters of convenience above Smith's need for exercise. See Harris v. Angelina County, 31 F.3d 331, 335-36 (5th Cir. 1994) (practical difficulties to mitigating prison overcrowding did not establish as a matter of law that prison officials had not acted with deliberate indifference when officials were aware of the conditions and had available alternative avenues to address the conditions).

Allen, 48 F.3d at 1088.

Allen, however, differs significantly from the instant case.  Allen's deprivation was the result of his confinement in a special housing unit for an "indefinite and therefore potentially long-term" and imposed restrictions motivated by concerns of convenience to the prison. 48 F.3d at 1088. In contrast, Defendants here were responding for a relatively short period of time in a reasoned and gradual response to restoring safety after a major riot and reasonably doing so to protect the health and safety of staff and inmates, including Plaintiff.

Based on the undisputed facts before the Court, Defendants here would be entitled to qualified immunity if there were a basis for imposing liability against them, and, as noted above, there is not.

## V.   CONCLUSION AND RECOMMENDATIONS

Based on the foregoing, the Court HEREBY RECOMMENDS that:

1.  Plaintiff's motion to strike (ECF No. 59) be DENIED;

2.  Defendants' motion to strike (ECF No. 62) be GRANTED;

3.  Defendants' motion for summary judgment (ECF No. 54) be GRANTED; and

4.  This action be dismissed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within

fourteen (14) days after being served with the findings and recommendations, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   August 27, 2015         /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE